IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BONNIE STEPHENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:04-cv-1161-F |
| | ) | |
| REGIONS BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bonnie Stephens (hereinafter "Stephens") brings suit against her former employer Regions Bank (hereinafter "Regions") alleging discrimination in Regions' termination of her employment on November 21, 2003.  Specifically, Stephens alleges 1) gender discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et. seq.*; 2) age discrimination in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et. seq.* ("ADEA"); and 3) discrimination with respect to pension benefits in violation of § 510 of the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1140 ("ERISA").  Regions denies that its decision to terminate Stephens involved discrimination on the basis of gender, age, or pension benefits.  This cause is before the Court on Defendant's Motion for Summary Judgment (Doc. # 13).

### I. Jurisdiction and Venue

The Court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 42 U.S.C. § 2000e *et. seq.* (Title VII),  29 U.S.C. § 621, *et. seq.*

(ADEA), and 29 U.S.C. § 1140 (ERISA).  The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations of each.

## II. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' that it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material

2

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

### III. Facts

The Court has carefully considered all documents submitted in support of and in opposition to the motion.  The submissions of the parties establish the following facts.

*A. Stephens' Employment History*

Stephens is a former employee of Regions Bank.  She started working for Regions in 1981 as a secretary and received various promotions over the years.  Effective January 1, 2002, she was promoted to Loan Officer II at the branch office in Troy, which is the position she held at the time of her termination.  As Loan Officer II, she primarily made "retail" or consumer-based loans as opposed to "commercial" or business loans.  Her annual salary was $41,500.  From 1981 through the end of 2002, Stephens routinely received annual performance ratings indicating that she was meeting or exceeding the requirements of her job.  In her annual reviews, her supervisors commented that she was professional, worked well with others, and had great customer service skills.  During that time, she routinely

received raises when promoted and merit increases each year.

From 1999 to 2002, Stephens reported to Randy Grissett, who was then the City President of Regions' Troy operations.  In January 2003, Grissett resigned and several Regions' senior management officers stepped in to handle Grissett's responsibilities until they could find a replacement.  On January 28, 2003, Tim Bartgis began serving as acting City President and assumed most of the day-to-day supervisory responsibilities of the banking operations in Troy.  Bartgis reported to Russ Dunman, who visited the Troy branch on a periodic basis and kept in constant communication with Bartgis.  Dunman in turn reported to Carl Barker.

During the time Grissett was president, only loans over a certain amount had to be approved by Grissett.  On January 10, 2003, Brad Armagost, the Executive Vice President, sent an e-mail to James Ketchum, the Commercial Lender in Troy, and Taron Thorpe, the Branch Manager in Troy.  The e-mail indicates that loans over their limit that previously had to be approved by Grissett were now to be approved either by Sonny Farris (commercial/Shaw loans) or Dunman (consumer/retail loans).  The e-mail does not mention loans within their lending authority, suggesting that those loans did not require approval. In late January 2003, Stephens became aware of a policy requiring all new loans to be approved by either Bartgis or Dunman.[1]  Nonetheless, in a February 19, 2003 e-mail to

---

[1] Bartgis claims Stephens was present at a January 2003 meeting during which the new approval procedure was discussed.  Stephens denies having heard about the procedure at the meeting, but admits learning about it from other lenders sometime soon after the meeting.

Dunman and Barker, Stephens stated that "[u]ntil I hear from you differently, I will continue to process loans within my lending authority before getting Tim's [Bartgis] approval." Dunman responded to this e-mail by informing Stephens that anytime Bartgis was present, all loans were to be approved by him. Stephens claims that she sent this e-mail because there was ambiguity in the instructions concerning loan approval.  She believed that, as in the past, she only needed get approval for loans outside her lending authority and wished to confirm her understanding of the policy. Regions alleges that Stephens was openly challenging Bartgis' authority by going outside the chain of command and directly communicating with his superiors, Dunman and Barker.  Regions also asserts that Stephens was generally uncooperative with the new leadership.

Regions alleges that Bartgis continued to have problems with Stephens, leading him to draft a written reprimand.  Bartgis filled out the appropriate Disciplinary Form, which was approved (with minor changes) by Angela Parker, who was responsible for human resources issues in Central Alabama, including Troy.  The information in the report was based upon Bartgis' observations of Stephens' behavior from January 28, 2003 to February 19, 2003. The report lists the following disciplinary violations:

1.     Missing three consecutive Officers meetings

2.     Missing the Chart the Course Sales Call meeting

3.     Not being a team player; being uninterested in issues that do not directly affect her

5

4. Being critical of bank management and having a lack of respect for co-workers

5. Insubordinate behavior and lack of respect for authority shown by her argumentative style

6. Inflexible behavior

7. Being disrespectful of other team members

8. Poor attendance and tardiness record

9. Failure to get loans approved by Bartgis or Dunman

10. Not meeting Regions' goal concerning net charge offs

The report also required Stephens to comply with certain recommendations, including that she display a positive demeanor, work as a team player, attend all meetings, have all loans approved prior to notifying customers of approval, refrain from negative comments concerning management, and make every effort to be at work.  In addition, she was required to request personal days in writing with ample advance notification time and to provide a doctor's excuse when absent due to illness.  She was also required to improve her loan charge offs.  Finally, the report notified her that if immediate improvement was not made in these areas, she may be subject to further disciplinary action, including termination.

On March 4, 2003, Bartgis and Dunman held a meeting with Stephens to discuss the report with her and stress the need for her to comply with management's instructions.  She was given a copy of the report and placed on probation for 90 days.  Stephens asserts that

this was the first time that she had been made aware of any performance deficiency; she had not received any prior written or oral notice.  Bartgis claims that he orally counseled Stephens prior to writing up this report, but admits that he did not reduce the counseling to writing per Regions' human resources policy.  Regions claims that Stephens was defiant and argumentative during this meeting, questioning and challenging every basis for the disciplinary action.  At the bottom of the Disciplinary Report, she wrote "I have received a copy of this report.  I am asking for a specific incident of these broad statements.  I totally deny these allegations."  Bartgis composed an e-mail to Parker responding to Stephens' request for more information by describing the events forming the basis for her disciplinary action.  Parker forwarded this e-mail to Stephens. On April 2, 2003, Stephens followed up her denial by sending a six-page rebuttal letter to Parker challenging all of the violations listed in the report.

Stephens' responses to the report are as follows: [2]

1.   She denies the allegations of not being a team player and being inflexible, stating that she has always been cooperative and "an effective representative of the bank."

2.   She admits missing the three consecutive meetings, but offers reasons for not attending them.  As to the January 28, 2003, meeting, she states that she

---

[2] Stephens sets forth responses to the allegations both in her rebuttal letter and in her Memorandum in Opposition to Defendant's Motion for Summary Judgment.  The following responses are taken from both documents.

missed it because she only received notice of the meeting about an hour before the meeting was supposed to take place and had previously scheduled an interview with a loan customer during the time of the meeting.  As to the January 29, 2003 meeting, she states that she had scheduled a personal day off before she received any notice that a meeting was scheduled for that day. Finally, as to the February 5, 2003 meeting, she states that she received an e-mail about the meeting, advising anyone who could not attend to notify Bartgis. She states that she called Bartgis, then met with him prior to the meeting to learn what topics were to be covered during the meeting.[3]

3.    As to not attending the February 19, 2003 Chart the Course Sales call, she states that she was not invited to the meeting until after it was over.  She states that she was not required to attend such meetings and had only done so twice in the past, once when she was asked to cover for another employee who had a scheduling conflict and once when she had attended an officers' meeting prior to the call and chose to stay for the call itself.  It was only after the February 19, 2003 call was over that she received an e-mail asking her to attend future calls.

4.    As to being critical of bank management and lacking respect for co-workers,

---

[3] Bartgis does not recall excusing Stephens from the meeting and denies meeting with her to go over the topics to be covered, but admits that if he had excused her, he would not have disciplined her for not attending.  Stephens' Expense Report for February 2003 shows that she was reimbursed mileage for driving to the main bank to meet with Bartgis on February 5, 2003.

8

she states that these charges arose from her comments during two meetings on February 6, 2003, one with Bartgis, then one with both Bartgis and Parker. While she admits complaining about a co-worker during those meetings, she asserts that Bartgis and Parker had invited her to candidly discuss any concerns or issues she had with Troy Bank.

5.   As to not getting approval for loans, she stated that she previously had authority to approve loans up to $35,000 ($20,000 unsecured) and that Dunman had asked all of the leaders to continue with operations as they had in the past.  While she missed the meeting at which Bartgis stated that he would have to approve all loans, she discussed what was covered with someone who had attended the meeting and believed that Bartgis had meant that he needed to approve only loans that had not been within the leaders' previous authority to approve.  She admitted to approving one loan that was outside her previous authority without consulting Bartgis, but claims that it was due to a mistake made by her assistant.  On February 19, 2003, Bartgis told her that he needed to approve all loans.  She believed this to be in conflict with what she had previously been told.  While discussing the matter with Bartgis, she suggested that they call Dunman to clarify the matter.  She was unable to reach Dunman by phone at that time, but left a message for him and sent him an e-mail requesting clarification.  Dunman responded to her e-mail

on February 19, 2003, stating that she did in fact need to get all loans approved by Bartgis.  Bartgis has acknowledged that, from that point on, she had complied with the approval procedures.

4.      As to the issues of absence and tardiness, she asserts that she was out on approved sick leave or bank business.

5.      As to the personal net charge offs, she claims that the statistics cited were misleading because they did not take into account her entire portfolio of loans.

Parker passed the letter on to Bartgis.

In March 2003, Kimberley Edwards was named as City President of Regions for Troy and Bartgis' supervision of the Troy banking operations ended.  During the first three months of Edwards' tenure, Stephens was still on probation.  During the probation, she substantially complied with Regions' expectations and completed the probation without incident.

*B. Stephens' Termination*

In November 2003,  two incidents occurred which Regions claims ultimately led to Stephens' termination.  The first occurred on November 6, 2003.  On that day, a meeting was held at the main branch in Troy.  In attendance were Stephens, Edwards, Barker, bank officers Robert Smith and James Davis, and Regions' outside counsel Frank E. "Chip" Bankston, Jr.  Regions asserts that during this meeting, Stephens became belligerent, disrespectful, and condescending to Bankston in the presence of all others in attendance.

Regions states that she was very confrontational about actions Bankston had taken with regard to a loan on which Stephens had been the loan officer.  Immediately following the meeting, Barker called Parker to report Stephens' behavior.  Edwards stated that Stephens never raised her voice, cursed Bankston, or threatened anyone during this meeting, but felt that Stephens' tone of voice and the type of questions she asked implied that she believed Bankston to be incompetent.  Stephens admits that she was direct with Bankston, but denies that she acted improperly at this meeting.

The second incident occurred on November 7, 2003.  On that day, a Regions customer asked Stephens for a copy of the customer's credit report.  Though Stephens knew it was against Regions' policy to furnish a customer a copy of his or her credit report, she told the customer to ask Regions clerical employee Angie Adams to fax to copy of the credit report to the customer.  When the customer contacted Adams, Adams informed the customer that it is against Regions' policy to provide customers with copies of their credit reports.  Adams then sent Stephens a note to Stephens which read, "Since we are not supposed to give customers a copy of [their credit reports] I'm going to let you do it-I don't want to be responsible for it."  Adams also informed Edwards of the incident.  That afternoon, Edwards sent out an e-mail to Troy staff members reminding them that they were not allowed to give customers copies of their credit reports or tell them what their credit score is.  Two minutes later, Stephens sent an e-mail to Adams stating:

> Since you would not have been acting on my request Angie the responsibility would have not been on you.  In the future please check with me if you want

> to make sure that I did tell the customer something like that.  I will try to e-mail such requests if that would make you feel more comfortable so you could clear yourself.  But I do need assistance from you all occasionally with info from the credit files and there will be no time to wait until we can receive the credit file.  And I am aware that we normally do not give copies of the credit report to the customer.  Thanks anyway.

Stephens did not believe that Edwards' e-mail was an accurate statement of Regions' policy, so later that day, she sent an e-mail to Tom Siemers, the Regional Compliance Officer in Birmingham, asking: "Is it ok to provide the customer with a copy of his/her credit report if we make them a loan.  I know we can show them the report and discuss the contents.  Also, is it ok to discuss their credit scores?"  On November 10, 2003, Siemers replied to Stephens' e-mail, saying that it is a violation of the fair credit reporting act to provide a copy of a credit report to a customer and strongly recommending against discussing a customer's credit score with them.[4]  Prior to receiving this e-mail, Stephens went ahead and faxed the credit report to the customer.  Stephens asserts that she did not benefit from providing the customer with her credit report and was just trying to save the customer the expense of obtaining the information from a credit reporting agency.  She also asserts that other employees in Troy had provided credit reports to customers and were not disciplined.[5]

Based upon the incident at the November 6, 2003 meeting and the incident involving

---

[4] Edwards admits that she was incorrect in stating that it was a violation of Regions policy to tell a customer his or her credit score, but states that it was discouraged.

[5] Ketchum, a former Troy branch manager, confirms that he had given customers copies of their credit reports and was never disciplined for it. Tony Pittman, another former branch manager, also admits to having given customers credit reports and not being disciplined for it. Jack Rainey, a former bank president, admits that he provided customers with credit reports.

the credit report, Edwards recommended to her superiors and to the Regions human resources department that Stephens' employment be terminated.  Barker, Dunman, and Parker all discussed and concurred with Edwards' decision.  On November 23, 2003, Edwards and Parker met with Stephens to effectuate her termination.  At that meeting, she was presented with a Disciplinary Report indicating the reasons for her termination, namely her behavior at the November 6, 2003 meeting and her provision of the credit report to a customer.  Regions asserts that Stephens refused to sign the report and that she tore up the loan application and work-up sheet for a customer she had been working on and dropped it on the table in front of Edwards.  Stephens has not made any written comments on the November 23, 2003 Disciplinary Report.  At the time of her termination, Stephens was 47 years old.

Regions has not hired any employee in the classification of Loan Officer I or II since Stephens' termination.  A number of employees have been handling the work that was previously done by Stephens.  Specifically, James Davis took over her retail loans.  Edwards, Robert Guilford, and Todd Carpenter each took over some of her commercial loans.

On February 9, 2004, Stephens was hired by a competing bank as a loan officer at a higher base salary than the salary she earned at Regions.

*C. Regions' Retirement Benefits*

Employees hired by Regions prior to December 31, 2000 are eligible for a defined benefit retirement plan.  Pursuant to this plan, Regions makes all contributions and bears all

investment risks.  That is, if the investments do not perform as projected, Regions must make up the deficiency.  The plan also guarantees each employee an annuity, the amount of which is determined by their length of service and their salary during the last five years of service.  The defined benefit plan currently has approximately 8,000 participants.  Each employee's plan is not funded individually, but instead Regions contributes to one fund from which the benefits of all participants are paid.  The amount Regions must contribute to the plan depends on the amount of benefits owed to all participants and the investment income accrued each year.  If the investment income is enough to keep the plan fully funded, Regions does not have to make any contributions to the plan.   Regions' pension expenses were $538,000 in 2001 and $7.1 million in 2002.  Pension expenses were projected to be $18.7 million in 2003.

Employees hired after December 31, 2000 are not eligible for the defined benefit plan, but are only eligible for a 401(k) plan.  Under the 401(k) plan, the employee makes the contributions and bears all investment risks.  That is, the employee makes the investment decisions and obtains benefits based only on how well their investments perform.  Stephens was a beneficiary of both the defined benefit plan and the 401(k) plan.

In a letter dated January 26, 2004, Regions notified Stephens of her rights under the defined benefit plan and the 401)k) plan.  Stephens subsequently removed her 401(k) assets from Regions pursuant to an IRA rollover.  Regions acknowledges that it owes Stephens certain benefits under the defined benefit plan and Stephens does not contend that Regions

14

has refused to pay her these benefits.

*D. EEOC Charge*

On March 29, 2004, Stephens filed an EEOC charge alleging that she was discriminated against on the basis of gender and age.

## IV. Discussion

*A. Title VII Gender Discrimination Claim*

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). When an employee seeks to prove that her employer discriminated against her on the basis of sex, the test to be applied is the familiar burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny.

First, the plaintiff must establish a *prima facie* case of sex discrimination. To do so, the plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the job from which she was discharged; (3) she was discharged; and (4) she was treated less favorably than a similarly situated individual outside her protected class or her former position was filled by a non-minority. *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003). Establishing a *prima facie* case is not onerous; it requires only that the plaintiff set forth facts adequate to permit an inference of discrimination. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). There is no question that Stephens is a member of

a protected class or that she was discharged from her position at Regions. In addition, there is no disagreement between the parties as to her qualifications for the position. The issue is whether Stephens has put forth sufficient evidence that she was treated less favorably than a similarly situated male employee or that her position was filled by a male employee.

The parties agree that no one has been hired for the position of Loan Officer I or Loan Officer II since Stephens' termination. So, the question is who assumed Stephens' duties and was that individual a non-minority (*i.e.* a male employee). Stephens alleges that James Davis assumed her duties following her termination. To support this contention, Stephens points to Barker's statement that no one was hired to replace Stephens because Davis was moved out of the security position into her job. In addition, Edwards testified that Davis took over Stephens' retail loans. Davis himself testified that he had taken over some of Stephens' duties. Stephens' commercial loans were handled by Edwards, Guilford, or Carpenter. Since it seems that no one individual assumed Stephens' duties and all of the individuals who assumed some of her duties were not male, Stephens has not presented enough evidence to show that her position was filled by a male employee.

Stephens may still make out a *prima facie* case if she has put forth enough evidence to show that she was treated less favorably than similarly situated male employees. "In determining whether other [employees] are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maynard*, 342

F.3d at 1289 (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), *modified by* 151 F.3d 1321(1998)).  The most important factors for the court to consider are the nature of the offenses committed and the nature of the punishment imposed. *Id.*  The Eleventh Circuit has adopted two different definitions of "same or similar misconduct."  The first standard "require[s] that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999).  The second, less stringent standard, requires only that the conduct be "similar." *Anderson v. WBMG-42*, 253 F.3d 561, 565 (11th Cir. 2001).  Under either standard, Stephens has not put forth enough evidence to establish that she was treated less favorably than similarly situated male employees.

Stephens claims that several other employees provided credit reports to customers and were not terminated or otherwise disciplined for doing so.[6]  Even assuming this is true, Regions claims that Stephens was not terminated only for providing the credit report, but also for her behavior during the November 6, 2003 meeting. Stephens has put forth no evidence of a male employee who both provided a credit report to a customer (or violated a similar work rule[7]) and conducted themselves as Stephens is alleged to have done during

---

[6] *See supra* note 5.

[7] When mortgage loans are made, federal law requires certain disclosures be made to the borrower within three days of the loan application being made.  Stephens alleges (and Bartgis acknowledges) that several Troy employees were backdating their required disclosures. Assuming this is true, however, backdating is not similar enough to the allegations against

the November 6, 2003 meeting.[8]  Therefore, Stephens has not met her burden of establishing

a *prima facie* case of sex discrimination and summary judgment is due to be granted in favor

of Regions on this issue.

*B. ADEA Age Discrimination Claim*

The ADEA makes it "unlawful for an employer...to fail or refuse to hire or to

discharge any individual or otherwise discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's

age."  29 U.S.C. § 623(a)(1).

> When a plaintiff alleges disparate treatment, 'liability depends
> on whether the protected trait (under the ADEA, age) actually
> motivated the employer's decision.  That is, the plaintiff's age
> must have "actually played a role in [the employer's
> decisionmaking] process and had a determinative influence on
> the outcome.

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141 (2000) (quoting *Hazen Paper*

*Co. v. Biggins,* 507 U.S. 604, 610 (1993).  The courts have often recognized that this inquiry

implicates analyses of the mental processes of employers for which there is seldom eye-

witness testimony.  *Id.*  Consequently, the courts have applied some variation on the

framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and its

progeny to analyze ADEA cases brought primarily on circumstantial evidence.  *Reeves,* 530

---

Stephens to show discriminatory treatment.

[8] While Stephens denies having acted unprofessionally at the meeting, the standard for
comparing similarly situated employees is not only to compare what they have actually done, but
also what they have been accused of doing.  *See Maynard*, 342 F.3d at 1289.

U.S. at 141 (collecting cases); *Turlington v. Atlanta Gas Light Co.,* 135 F.3d 1428, 1432 (11th

Cir.), *cert. denied,* 525 U.S. 962 (1998).  Thus, an employee bringing a claim under the

ADEA must initially establish a *prima facie* case of discrimination through one of three

methods: by presenting direct evidence of discriminatory intent, presenting circumstantial

evidence of discrimination by satisfying the analysis set forth in *McDonnell Douglas* and its

progeny, or by introducing statistical evidence of discrimination.  *See, e.g., Walker v.

NationsBank of Florida, N.A.,* 53 F.3d 1548, 1556 (11th Cir. 1995).  Here, Stephens has

presented no direct evidence of discriminatory intent.

Stephens presents some statistical evidence concerning age discrimination. In 2002,

Jack Rainey retired from his position as President at age 62.  He was replaced by Grissett,

who was 35 years old at the time.  Grissett remained in his position for only a year, then was

replaced by Edwards, who was 29 years old when she was hired in March 2003.   In July

2004, Guilford was hired as a Commercial Loan Officer I at age 23.  Taron Thorpe was hired

as a Loan Officer I in 1997 at age 31.   He was later promoted to Vice President, then

transferred out of state in 2003.  Ketchum retired from his position as branch manager in

March 2005 at age 58 after a 34-year career at Regions.  He was replaced by his assistant

branch manager Sylvia Davis, age 47.  No one over the age of 40 has been hired since 2000.

The mere fact that older workers who choose to retire are being replaced by younger workers

is not enough evidence to establish a *prima facie* case of age discrimination.

As to circumstantial evidence of discrimination, under the *McDonnell Douglas*

analysis, the plaintiff must first establish a *prima facie* case of discrimination.  In the context of age discrimination, an employee must produce evidence that (1) she is a member of a protected  group of persons between the ages of 40 and 70; (2) she was qualified for the position held; (3) she was terminated; and (4) she was replaced with a substantially younger person.  *See Damon v. Fleming Supermarkets of Fla.,* 196 F.3d 1354, 1359 (11th Cir. 1999).  Stephens was 47 years old at the time of her termination.  There is no dispute as to whether she was qualified for the position she held.  Therefore, the only issue is whether she was replaced with a substantially younger person.

As set forth above, no one was hired as a Loan Officer and no one individual took over Stephens' duties following her termination.  Stephens asserts that Davis took over her retail loans, but Davis is over age 40, therefore is not substantially younger than Stephens.  Stephens also asserts that three employees under age 40, Edwards, Guilford, and Carpenter, took over her commercial loans.  Both Guilford and Carpenter were hired after Stephens had been terminated.   While this is not exactly proof that Stephens was replaced by a substantially younger person, "[t]he particular circumstances of some age discrimination cases require flexibility in analyzing whether a prima facie case has been established." *Pace v. S. Ry. Sys.*, 701 F.2d 1383. 1386-87 (11th Cir. 1983).   That is, there are "instances in which the facts of a particular case will present a prima facie case even though the plaintiff was not replaced by one outside the protected age category." *Id.* at 1387.  Here, the Court finds that Stephens has put forth enough evidence to establish a *prima facie* case of age

discrimination, despite the fact that she cannot show that she was replaced by a substantially younger employee.

Once a plaintiff establishes the requisite elements of the *prima facie* case, the defendant has the burden of producing a legitimate, non-discriminatory reason for the challenged employment action. *See, e.g., Holifield v. Reno,* 115 F.3d at 1564 (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981)). The employer's burden is "exceedingly light." *Holifield,* 115 F.3d at 1564. This burden is one of production, not persuasion and consequently, the employer need only produce evidence that could allow a rational fact-finder to conclude that the challenged employment action was not made for a discriminatory reason. *See, e.g., Davis v. Qualico Miscellaneous, Inc.,* 161 F. Supp. 2d 1314, 1321 (M.D. Ala. 2001). Here, Regions asserts that Stephens was terminated because she provided a customer with a copy of the customer's credit report and because of her unprofessional behavior at the November 6, 2003 meeting. Stephens admits to having provided the credit report knowing that she was violating Regions' policy. While Stephens denies behaving unprofessionally at the meeting, the testimony of others present at the meeting concerning her insubordination is enough evidence that could allow a rational fact-finder to conclude that her termination was not made for a discriminatory reason.

Thus, the burden now returns to Stephens to supply "evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real

reasons for the adverse employment decision." *Davis,* 161 F. Supp. 2d at 1322 (citing *Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)).  The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256; *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997).  A plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves,* 530 U.S. at 148.  Stephens admits that she provided the credit report, but asserts that she did not act unprofessionally at the meeting.   James Davis, who attended the meeting, did not think she acted unprofessionally during it.  Edwards did not advise Stephens that her behavior at the meeting was inappropriate until the day Stephens was terminated, which was 17 days after the meeting.  Even assuming Stephens did not act unprofessionally at the meeting, Regions honestly believed that she did.  As long as an employers' beliefs were reasonable, they can be mistaken without it implying that they acted with discriminatory motive. *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) (stating that "[w]e are not interested in whether the conclusion is a correct one, but whether it is an honest one. . . . our sole concern is whether unlawful discriminatory animus motivated a challenged employment decision").

As additional evidence of pretext, Stephens alleges that Bartgis treated numerous

older employees unfairly.[9]  While this may be so, there is no evidence that Bartgis had any

involvement in the decision to terminate Stephens.  At the time of her termination, Edwards

had taken over as president and was the one who made the decision to terminate Stephens.

Therefore, even viewing the facts in a light most favorable to Stephens, she has not met her

burden of proving that Regions' reasons for her termination were pretextual.  Thus, summary

judgment is due to be granted in favor of Regions on Stephens' age discrimination claim.

*C. ERISA Claim*

Section 510 of ERISA makes it unlawful to "discharge, fine, suspend, expel,

discipline, or discriminate against a participant or beneficiary . . . of an employee benefit

plan . . . for the purpose of interfering with the attainment of any right to which such

participant may become entitled under the plan."  29 U.S.C. § 1140.  This section prohibits

interference with both present pension benefits and future entitlements to receive benefits.

*Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222 (11th Cir. 1993) (stating that "§ 510

prohibits the employer from discharging an employee for the purpose of preventing the

employee from receiving additional vested benefits").

The Eleventh Circuit applies the following test to determine whether there has been

---

[9] Pittman was terminated from his position as branch manager on February 11, 2002 due to a poor annual evaluation written by Bartgis.  Prior to his termination, he had never been put on probation or received any written warning.  At the time of his termination, he was 53 years old. Richard Landgraf, former branch manager of one of Regions' Prattville branches, was written up by Bartgis on April 6, 2001 and was put on probation.  At the time, he was 59 years old.  Finally, Sandra Northington, also a former branch manager, resigned from her position in July 2003 at age 47.  Northington claims she resigned because she was unable to work for Bartgis.  Bartgis had criticized Northington on numerous occasions.

a violation of § 510:

> The ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights. A plaintiff is not required to prove that interference with ERISA rights was the sole reason for the discharge but must show more than the incidental loss of benefits as a result of a discharge. This burden can be shown either by showing direct proof of discrimination or by satisfying the scheme for circumstantial evidence established by *McDonnell Douglas*.

*Id.* at 1222-23 (citations omitted). Stephens has presented no direct evidence of discrimination based upon her entitlement to pension benefits, therefore her discrimination claim must be evaluated using the *McDonnell Douglas* analysis.

As with the gender and age discrimination claims, Stephens must first set forth a *prima facie* case of discrimination on the basis of her right to pension benefits. In the context of a § 510 claim alleging unlawful discharge, a plaintiff may establish a prima facie case by showing that (1) she is entitled to ERISA's protection; (2) she was qualified for the position; and (3) she was discharged under circumstances that give rise to an inference of discrimination. *Id.* at 1223. The parties do not dispute that Stephens is entitled to ERISA's protection or that she was qualified for the position from which she was terminated. The question is whether the circumstances of her termination give rise to an inference of discrimination. To satisfy this element, Stephens does not need to prove discriminatory intent, but must introduce evidence that suggests interference with ERISA rights was a motivating factor behind her termination. This can be done in two ways.

First, Stephens may offer evidence directly showing that the desire to interfere with

her benefits motivated her termination. Stephens has provided evidence that Bartgis targeted several employees who were covered under the defined benefit plan.[10]  While this may be true, as stated above, there is no evidence that Bartgis was involved in the decision to terminate Stephens.  Therefore, evidence of the Bartgis' actions has nothing to do with the motivation behind Stephens' termination.

Alternatively, evidence that her termination resulted in a substantial savings in benefit expenses would be enough to infer discrimination.  *Id.* at 1224.  Stephens asserts that because Regions' pension expenses were escalating, Regions had an incentive to terminate employees hired prior to December 31, 2000 in order to reduce those expenses, since employees hired after that date were not eligible to participate in the defined benefit plan. However, Stephens admits that employees hired before December 31, 2000 have vested rights that are not affected by their termination; only their rights to accrue future benefits are reduced by termination.  Stephens does not offer any evidence that this reduction in future benefits would result in a substantial savings for Regions.  In addition, because of the way in which Regions' pension fund works, the termination of one or even several employees may not have a significant effect on Regions' pension expenses.  The contribution Regions

---

[10] Ketchum, a former branch manager who was covered under the plan, retired in March 2005 at age 58.  During his 34 years of employment with Regions, he had never received any written disciplinary action prior to reporting to Bartgis.  He received a written warning from Bartgis, which he believed was the first step toward termination, so he chose instead to retire early.  Ruby Winkles, a former assistant branch supervisor who was also covered under the plan, resigned in July 2004 at age 49 because she had been written up and put on probation by Bartgis. She had never previously been written up.

must make to the fund depends on the total amount of benefits that it owes to all of its employees and on the amount of investment income accrued by the fund. While reducing the amount owed to each employee by terminating them before they were able to accrue additional benefits might save Regions money, Stephens has provided no evidence that her termination has resulted in substantial savings. Therefore, Stephens has not met her burden of showing a *prima facie* case of discrimination based on her right to receive pension benefits and summary judgment is due to be granted in favor of Regions on Stephens' ERISA claim.

## V. Conclusion

For the reasons stated above, it is hereby ORDERED that the Defendant's Motion for Summary Judgment (Doc. # 13) is GRANTED.

DONE this 25th day of October, 2005.


_____
        /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE